Ms. Abelson, are you ready? Good morning, Your Honors, and may it please the Court. My name is Laura Abelson, and I represent the plaintiff appellants in this matter, J.D. and his parents, John and Jane Doe. The District Court erred in this case in three primary ways, one that is factual and two that are purely legal. First, this case has a mountain of disputed facts. The District Court acted as the fact finder and took the case away from the jury. Second, the District Court improperly applied the deliberate indifference standard to give complete deference to school officials' handling of the sexual harassment reports. And third, the District Court applied the heightened deliberate indifference standard to the Doe's negligence claims. The question in this case is, could a reasonable jury conclude that knowing what they knew at the time, school officials failed to recognize a pattern of sexual harassment and take steps reasonably calculated to prevent that harassment from continuing? And the answer is yes. The District Court in this case misapplied the summary judgment standard. It made improper credibility determinations and ignored the requirement that it view the evidence in the light most favorable to the non-moving party. Yes, but the basic difficulty you had was the standards set forth in the Davis case that you had to create a triable issue, at least on your federal claim, not just of negligence but of deliberate indifference. And, you know, there's language in Davis that says courts should refrain from second-guessing the disciplinary decisions made by school administrators and those on school administrators will continue to enjoy the flexibility they require unless their actions are clearly unreasonable. And so your argument on your federal claim, the difficulty as I see it is a deliberate indifference standard, which all the cases stress is quite different from a negligence standard. You have to create a triable issue over deliberate indifference. Yes, Your Honor. And actually that goes to my second point, the first major legal error that the court made. And that is that, as Your Honor stated, Davis requires that the actions be clearly unreasonable. But then the Supreme Court went on to define clearly unreasonable as that which makes a student vulnerable to continued harassment. So complete deference to the school officials' handling, the assumption that any action is action that is not clearly unreasonable is the wrong legal standard. And the question is really, did they take actions that were reasonably calculated to be effective and remove the vulnerability? The district court failed to address whether the school... Your Honor, I thought that she rearranged the classroom in order to keep J.D. and M.O. as far apart as possible. And a reasonable juror could find that that action was not clearly, was not calculated to be effective. This was a Montessori school... Well, but that gets into the second guessing the Supreme Court tells us to shy away from. I mean, the difficulty I have there is that it's, I mean, you can always say that something wasn't effective or not, but clearly indifference means that you ignore something. Yes. And in this case, the teacher did ignore that that would not be effective in separating the boys. She testified that this is a Montessori classroom and students do not sit at their desks for the bulk of the day. And therefore... What do they do at the Montessori school? Well, it's an alternative way of educating students that... Well, I understand that. I've heard that. It's a public school, right? It is a public school. So, I mean, but it's an alternative way. How do they decide who goes to the Montessori school, who goes to the regular school? I do not know, and actually, and I don't believe that that is critical to the discussion. Well, it might not be. I'm just trying to find out what's special about the Montessori school. Why do they call it Montessori? Well, in this case, it's because they use the Montessori philosophy, which is a more, it's a less rigid way, educational philosophy. And that it is a Montessori school is only relevant to this particular point. They have multiple grades in the same room? Yes. There are multiple grades in the same room. How many do they have in the room? I don't know. It's not in the record, Your Honor. You don't know? I do not know. I grew up over in West Virginia. We had two or three grades in the same room in a country school. We never did call it Montessori. I'm wondering if that's what I have. Perhaps, Your Honor. Perhaps, Your Honor. But here, the question is, for example, was this moving the desks an action that was reasonably calculated to keep the students apart? And in the context of this school, under the totality of the circumstances that the Supreme Court required. Well, that's only one of the things they did. I thought that Johnson, who was a teacher, actually called M.O.'s parents. Once, Your Honor. Once. Out of the 10. But I was just saying that he or she called M.O.'s parents. And she also placed M.O. on behavioral probation. Whether or not M.O. was placed on behavioral probation is a disputed fact in this case. There is no evidence in his school file that he was ever placed on behavioral probation. And there's testimony that behavioral probation was a very rigid type of discipline. And a reasonable jury could find. Why did Johnson call the parents? She called them. To alert them to M.O.'s behavior. She called the parents once in the only one of the 10 instances of reported sexual harassment about which the district admitted. She called M.O.'s parents once. That is not a reasonable response. A jury could find that that is a clearly unreasonable response. Was M.O. given a week of in-school suspension? That was the same incident. It's the same incident. He was given a week of in-school suspension. He was given some sort of in-school suspension. It's disputed whether it was a week or a day. But yes. Where was the in-school suspension served? I believe in an administrator's office. It was in an administrative office. So he was taken out of the classroom. Correct. For one of the 10 instances of sexual harassment. And that goes to the basic factual error here. Are you including the three incidents about which they did not know? No, I'm not. Because I thought there were, for the first year, I thought there were fewer incidents. And I thought that each incident, almost each incident, provoked a response. For instance, when he crawled under the bathroom partition, they put in a sign-in system. They had an escort system. When he did the humping, they suspended him five days. When he climbed under the desk, they moved him to the far side of the room. And there was a response each time that they thought would address what they learned at that point. Well, I have two responses to Your Honor's question, Judge Niemeyer. First, the district court only acknowledged five of the 10 incidents that the record reflects. We've outlined it on Pages 3 and 4 of our reply brief in chronological order with citations to the record. There were at least 10 instances about which the school district's witnesses admitted they had knowledge. Yet the district court only considered five of them. And those credibility determinations were critical because they laid the foundation for the district court's conclusion that the incidents were isolated, and it allowed the district court's failure to respond to the rest of the incidents. What was an example of a couple that the district court didn't acknowledge? Sure. First, in March, after the humping incident, after the in-school suspension, Mr. Doe reported to the school that MO kept making sexual remarks to JD. The district court completely discredited that report. And then, so here, we have in the first year, there's an escalating series of sexual harassment. There are at least two instances of unwanted verbal harassment. There's name-calling, and then there's JD reports to the school that MO said something sexual to him in the school bathroom. That escalates to the incident in which MO exposed his genitals to JD in the school classroom, which then escalates further in March of that school year to the humping incident, and then to the report that MO, despite his punishment, continues making sexual remarks to JD. Were they prohibited from being in the bathroom at the same time? They were not prohibited from being in the bathroom at the same time. And that goes to my second point to Judge Niemeyer's question, which is that the steps taken in the second year related to the bathroom incident were also not calculated to be effective. There's testimony that the sign-in, sign-out statement, sign-in, sign-out book, Ms. Jellison testified that there were times the students didn't use it. And there's testimony in the record. Well, but there was a log system put in. The log system was not used consistently. The teacher testified. But they put the log system in. Yes, but then they didn't follow through with it. People would log in when they would go to the bathroom. It's true that that was the idea, but in implementation, it was not used consistently. And JD was given permission to use the nurse's bathroom. The nurse's bathroom, which is undisputed, is in a completely different building. So a reasonable jury could conclude. We're getting so much in the weeds here, and it makes me wonder whether we're doing – You know, this was not a school system which just kissed the whole problem off. I mean, you may dispute the effectiveness of things, but, you know, the question is you've got school administrators who are having to deal with a variety of student interactions every day, including, you know, some students don't like each other. Some students say unkind things to each other. These incidents are just almost never-ending in number, and it's very difficult to deal with them because if they jump down MO's throat, then his parents come in. And if he's suspended, then, you know, sometimes they get another lawsuit there. We're familiar with those. So, you know, here in this courtroom, we're dealing with this one little isolated interaction with two people. But anybody who's ever been in a classroom, you know, knows that the human dynamics in those classrooms are, you know, almost half the time it's all a teacher can do to give instruction. They try. The record shows you dispute this or that, but the record shows they took steps. They tried. The question is not whether they took steps, but whether the steps that they took were reasonably calculated to stop the harassment. And this is a summary judgment. I know, but that standard, reasonably calculated to stop the harassment, that is just not what the court in Davis said. They said clearly unreasonable. That's the phrase. They said deliberate indifference. They said don't second guess. And then they used, they did not use what you said about reasonably calculated. And when they use the word unreasonable, they say clearly unreasonable. Yes, and clearly unreasonable. I see that my time is up. I'd like to use a couple minutes of my rebuttal to address. You can complete your thought. Thank you, Your Honor. The clearly unreasonable standard is further defined as actions that, deliberate indifference is further defined as actions that make a child vulnerable to continued harassment. And the question is, what does that mean, to make a child vulnerable to continued harassment? The Department of Education has stated that actions that are not reasonably calculated to stop the harassment make a child. That's not the standard for resolving this case. It's not the standard for resolving this case necessarily, but. That deals with the interactions between DOD and the school system. No. It may deal with funding issues or whatever, but it's not the standard in a private cause of action. Actually, that part of it is. That is the DOJ, that's the Department of Education's guidance that relates to private causes of action for damages. There are other parts of that document that don't relate to this, but that aspect does. And if the Department of Education thinks that actions that are not reasonably calculated to prevent the harassment make a child vulnerable to continued harassment, then a reasonable jury could also find that actions that are not so calculated. Yes. Thank you, Your Honor. Thank you. Ms. Harrison, we'd be pleased to hear from you. May it please the Court. Good morning. Abby Harrison on behalf of the Appalese Board of Education of Prince George's County and Kathleen Schwab. Judge King, to answer your question about Montessori schools, the administrative procedure is found in the joint appendix at page 100. Parents voluntarily seek out to have their children attend Montessori school by participating in a lottery. And the Montessori program is one that is described in the administrative procedure as an interdisciplinary discovery-based approach to learning where children are placed in multi-age classrooms. In this case, the Appalese believe that Judge Williams was correct in granting summary judgment as a matter of law on all of the claims filed by the appellants in this case. All they're seeking here is damages, right? That is correct, Your Honor. No injunctive relief sought against anybody or any entity. That is correct, Your Honor. They want damages from the school board and one individual, Ms. Schwab. Well, we believe that the appellants have actually waived any rights they may have had to seek relief against Mrs. Schwab because the only claim that possibly related to her specifically was gross negligence. And as noted in footnote four of Judge Williams' memorandum opinion, there was little attention given to this claim by the appellants at the summary judgment level. And in review of their brief here, there certainly was literally nothing to discuss the claim of gross negligence. So we believe that that claim actually is not really here on merit because it was essentially waived. To the extent of the Title IX and the negligence claims, the facts are the same, obviously. And there is not a mountain of undisputed evidence in this case. As a matter of fact, there is a mountain of undisputed evidence in this case between the unrebutted evidence submitted by the board and the admissions made by Mr. and Mrs. Doe as well as John Doe in their deposition testimony. We have to look at this in a two-year period. The school year 2008-2009 is where the majority of these alleged incidents occurred. There was not an escalation of events. Rather, there was a de-escalation of events between school years 2008 and 2009 and 2009 and 2010. In the first school year, John Doe was new to the school. And as Judge Wilkinson has recognized, we're talking about children at a particularly sensitive age, quite frankly, middle-aged school. And it was reported shortly after John Doe was enrolled that he was teased and names were called. I would point out to the court that what's unrebutted here are two documents prepared by school employees. Lisa Jellinson, the classroom teacher, prepared a written communication log, although not required to do so by any board policy or procedure. And her log is located in the joint sealed exhibit at page 314 where she goes through her entire school year of 2008-2009. And you'll see in that log all of the references to JD and MO. None of that, nothing that she wrote was rebutted about how she received the information and how she responded to the information. And in the name calling, one of the first things she did was that she had a class meeting and talked about respect. And then Mrs. Schwab, who was the assistant principal at that time, also has a timeline that she created. And that's found in the joint exhibit at page 323. That goes through both school years of every step that they took, every report that was made by the Doe family. We appreciate the fact that Mr. and Mrs. Doe were actively involved in their child's well-being and that they were concerned. But they, too, also admitted that they didn't know many of the things that later came out in hindsight after school year 2009-2010 ended. And that they had themselves, in fact, along with John Doe, advised Mrs. Schwab as late as April of 2010 that everything was fine and that there was nothing that they were aware of that there should be any concern about. I do believe that for each and every instance where reports were made, excepting de novo, the 10 incidents that are listed in the appellant's brief, I would argue that the 10th incident refers to name calling and making remarks with no dates, and quite frankly, can't be given any weight or credit. But for the 9 incidents that they list in their brief, 6 of them occurred during the 2008-2009 school year, and 3 occurred in the 2009-2010 school year. Although, as this court has correctly noted, that Davis doesn't require the conduct to be stopped. What it requires is to not have deliberate indifference and to respond in a reasonable manner. Now, what we have here is a situation where I think the appellants have confused Judge Williams' findings about the allegations themselves not being supported when an investigation was undertaken by the school by either watching a video or interviewing other students, and that's not a credibility finding. Judge Williams was very clear in his decision that Mrs. Schwab and the prior principal, Mrs. Johnson, who was deceased at the time, who died during the 2008-2009 school year, rather, that despite their inability to corroborate in most instances what had happened or what was alleged by John Doe, they accepted it as being true and responded accordingly. That is not a credibility determination. And as a matter of fact, it is quite clear in the record that Mr. Schwab did indeed respond, and there was more than one phone call in both of the written documents that I've alluded to earlier that are in the record. Ms. Jellison communicated with the parents, the classroom teacher, as well as Ms. Schwab by phone and in person during the course of those two school years. There's also the recognition that the appellees appreciate that although we respect and understand Mr. and Mrs. Doe's position that my child is having problems with this student at school and that we want you to address that, we also have to consider the alleged harasser. We don't have the luxury of just simply saying, okay, we accept everything you're saying is true and not get the other side of the story. In several instances, and the majority of instances, and even John Doe himself admitted in his deposition testimony that's in the record, that the majority of the time he didn't timely report these incidents. Sometimes it was... You just didn't go through, and I appreciate your argument, but you can go through some of the things that just some of the concrete steps that... Well, the concrete steps that were taken were in accord with the Student Conduct Code, which is in the Joint Appendix at 137. In 2008-2009, there was also an administrative procedure 4170, discrimination and harassment. And in that specific administrative procedure, it is stated that allegations by students against students, any student who has been found to have violated the harassment policy will be subject to disciplinary actions depending upon the severity of the offense. Such actions could include but not be limited to counseling, suspension, or expulsion. And this administrative procedure refers specifically to the Student Conduct Code. The school followed the Student Conduct Code in addressing the conduct issues that were brought to their attention regarding MO. They, in fact, did the counseling.  That was the first step. Then when there was the incident of MO dancing in the classroom, which they referred to as the humping incident, both girls and boys witnessed that. That was when he was given the in-school... Well, let me back up. Before the in-school suspension and after the counseling, MO was put on a behavioral plan. His parents were contacted. A conference was held with MO and his parents, indicating that the name-calling and other things that were being alluded to by JD was inappropriate. That's in the law. So it's counseling, behavioral plan, then the humping incident occurs. And in that situation, that's when he's placed on a five-day in-school suspension. That was in March of 2009. That ends all of the incidents for 2008-2009 that were actually reported to the school. So we go from March of 2009, and then we come to the fall of 2009. And again, there's allegations of name-calling, something that happened at... And again, these were vague. For example, JD made a report to Mrs. Schwab that MO said something to him at the water fountain that made him uncomfortable. And it wasn't timely reported. And Mrs. Schwab consistently would say to him, you know, you deserve to be safe, you deserve to feel comfortable, but you have to report things timely to me. And he did not do that. But despite her trying to ask him what exactly did he say, JD would not provide that information. But she had a conference with both of the boys at that point in the fall of 2009 and explaining to them appropriate conduct and that this will result if something more serious happens. The next thing is reported in January of 2010. Again, five, six weeks later, after the incident occurred sometime before the holiday break in December of 2009, where it's alleged that MO tried to come over the bathroom stall to get JD, and he had to crawl out from under... Although nothing on the videotape showed that the boys were in the same area at the time, which Judge Williams, that's one of the instances where he said there was nothing to support this. But despite that, the two things that were instituted at that point were the sign-in, sign-out procedures for the classroom and also an escort. Another student was designated to escort JD to the bathroom when he needed to go. And in addition, the nurse's bathroom outside her office was also offered. We don't dispute that the sign-in, sign-out procedure did not work as well as one would have hoped. However, the escort was still in place until JD himself and his father also agreed with him, and there's deposition testimony in the record, that it was too embarrassing for JD. He was being teased about having an escort, and he didn't want it anymore. He didn't feel like he needed it. Having taught school a little bit myself, not just in higher education, but sometimes in the summer, it's hard being a teacher. And middle school in particular, Your Honor. I've had principals tell me on some days they'd rather be having a root canal than to be with this group of children this age because there's so much discovery going on and so much awareness that's happening as they go to the maturation level. And so it becomes extremely difficult to always have a handle on what's going on, particularly when you're not being given all of the information. Now, I would note that as of January 2010, that was the last incident reported for that school year. In the record, JD testifies that they were... Are you saying that in that school year, there was the one incident before the Christmas holiday and then the one in January? No. The incident was reported in January, but it occurred in December of 2009. Nothing actually occurred in January of 2010 through the rest of the school year, and John Doe testifies, and it's in the record as well, that he is in fact... Mr. Schwab continuously came to him and said, how are you doing? And on most days when she asked, everything was going great. So I just want to get to the negligence. I think the Title IX is clear. There's no deliberate indifference here. There were reasonable responses. The Student Conduct Code does, in fact, address bullying and harassment and sexual harassment as being subject to disciplinary measures. So at all times, the actions of the school were right in accord and aligned with the standards articulated in Davis and Gebser, as well as by this court in the Jennings versus the University of North Carolina case. There's just no deviation there, and we believe that the appellants just cannot show a violation of Title IX. There is no need for a trial on that particular issue. As it relates to the negligence claim, the appellee's position is that the appellants have just simply misstated the duty. There is no such duty to investigate as articulated by Maryland case law. What the Lunsford case requires is that the school district has a duty to exercise reasonable care to look out for the safety of schoolchildren while they're under control of the school. There can be no dispute here that the school staff articulated their awareness of this standard of care. When Mrs. Schwab acknowledged to both John D. and his parents that he had a right to be free from being harassed and to feel safe on several different occasions. They met with MO's parents? Yes, they met with MO's parents more than once, and that is recorded in the log and the notes. To the extent that there was a duty, we, the appellees, believe that Judge Williams was correct. There's no breach of duty here. We acknowledge the duty outright. All of the corrective actions that I alluded to earlier in my argument apply just as well to the negligence case. Judge Williams was not correct in finding that the actions taken by the schools to respond to the complaint clearly show that there was not a breach of duty. One of the things that interested me, you caught a bit of attention when you're in the school environment because you certainly want to protect J.D. and do everything you possibly can. And sometimes, just remembering from different classroom experiences, sometimes when the teacher came down hard on someone like MO or whatever, you do what you need to protect the child. But if you start expelling people and making an example of them, then you have the parents from MO saying, what are you doing to my child? You're stigmatizing my child. And you haven't given them due process and I'm hiring a lawyer and I'm going to court. So whichever, it's a fine line that you have to walk. And if you go, if you just start throwing MO out of school, you've got a lawsuit. And, you know, his parents come in and say, you know, you've ruined my child's life. And the teachers have just caught him in the middle on this kind of thing. They do the best they can. Well, I do, I agree, Your Honor. And the Student Conduct Code itself states that the principle is that you should have an appropriate reaction to a disciplinary problem with the least extreme consequences, because we don't want to be throwing children out. These boys were 10 and 11 during all the time? Yeah, and then a year older. They were in fourth and fifth grade and then fifth and sixth grade. I just want to sum up by saying Judge Williams was also correct on the causation issue. Obviously, the school system was not the proximate cause of the injuries. And there is no connection, and it would be sheer speculation, that had they done something different, MO would not have behaved in the manner in which he behaved. There's also room to fine, and the evidence does support the affirmative defenses of contributory negligence and the assumption of risk. So the appellees would ask that this Court affirm Judge Williams on all counts in granting judgment to the appellees. Thank you. Thank you. Ms. Abelson, you have some rebuttal time. Thank you, Your Honors. I'd like to first address Judge Wilkinson's concern about student discipline and what the effect would be on the aggressor student, because we understand the difficulty that teachers are in, in this particular type of situation. Are you talking about Supreme Court cases that say their rights have to be… That's absolutely the case. And so what I want to talk about is what the school could have done that would have solved this problem and would have been calculated to protect J.D. that's not disciplinary action towards MO. So at a very minimum, they could have moved J.D. to a different class. That does nothing to MO. And, in fact, Ms. Jellison, the classroom teacher, testified that she knew that the children should be separated and that she was very surprised that they were placed in the same class. How many classes did they have for these students in these grades? I can't recall whether it was two or three, but there was another… At least one more? Yes. Is that what you're saying? And these were eight- and nine-year-old children in the first year and nine- and ten-year-old children in the second year. But you want us to second-guess the decisions of the people on the scene. I mean, appellate courts don't do a very good job of running schools, probably, and it's like they don't do a very good job running prisons. Fair enough. Fair enough, Your Honor. But that's not what we're asking you to do. We do better in the courtroom. We're not asking you to second-guess the school. But we are asking us to second-guess the school. Well, no. You want to do damages against Ms. Schaub, who was the principal for, what, one year of this situation? She was the acting principal for three quarters of the time. She was the acting principal and then she was the principal. Yes. But the Supreme Court has allowed- But you're saying what, she was the decision-maker throughout this? Yes. She was the decision-maker even when Ms. Johnson was the principal? She and Ms. Johnson were together the decision-makers and then she was the sole legislator. And you want her to be personally liable for damages in connection with all this? We did name Ms. Schaub. For making the wrong decision that you say is the wrong decision, she should have, instead of putting them on opposite sides of the classroom, she should have put them in different classrooms. Well, for the negligence claim, Title IX can't be pleaded against an individual. I was a school teacher for a while myself. I never imagined that they could be drawn into a federal court down in Richmond over making a decision on where to seat the children in the classroom. The Supreme Court in Davis allows for damages actions such as this. It does. It does. It's in your briefs and everything. But you don't want any injunctions. You don't want anything fixed. You just want the damages from Ms. Schaub, who's the on-the-scene trained expert. The school board, which is required under law to indemnify Ms. Schaub. Obviously, one of the best schools you've got in Prince George's County. And you want the school board to be liable. I mean, all that stuff. We want the school board to be liable because the school board violated Title IX and negligence law here by failing. That's money that's taken from a strapped educational budget. But this is a child who is repeatedly sexually assaulted and raped and has suffered significant psychological damage, psychological injury. No, if these things qualify as deliberate indifference, then you, I mean, I can see a thousand lawsuits behind this. Because if everything this school district did was still insufficient and we set up that kind of standard, we've opened the door to a hundred lawsuits within the next three or four years. That's, you know, that's what we're doing. The school teachers, staff are going to completely be called on the carpet and courts are going to just take over the role of institutional governance, you know, of yet another institution. And we don't have the expertise on it and we're not on the ground. And it really bothers me that people would have to make very tough decisions. And it seems to me, don't go over the line. It's clear from what they did, they were trying on this kind of thing. And if they get called on the carpet for that kind of thing, there are already enough difficulties recruiting teachers to teach in middle school classrooms. There is, teachers are contending with violence, they're contending with one thing after another. And if you add on to all of those difficulties of just trying to keep order in a classroom so that in a middle school classroom they can impart something of educational value. And then we send the message that regardless of what they do, they're going to be hauled into court and personally liable for damages. Then you have one more impediment to getting people who are going to be willing to teach in the middle school classrooms in this circuit. And this is not a teacher, this is, it would be a decision that was very hostile to educators that however you might think in hindsight that their actions did or didn't work, they tried. And there's no doubt in this record that they made an effort. They tried. And we don't need a jury to determine that because the standard is one of deliberate indifference. And you've got to create a triable issue of fact at that standard, that what they did was clearly unreasonable and what they did was deliberately indifferent. Respectfully, Your Honor, the teachers are in the best place to know what would be effective. And in this case, they made choices, they didn't even follow through with their own decisions. But we don't, we're not in the business of second-guessing teachers' decisions in the classroom. How can courts get into that, except in the most extreme circumstances? We're not asking, Your Honors, to change the law, to allow a jury. Where to seat the children in the classroom or which classroom to assign them to? Make her personally liable? I see that my time has concluded. We believe this case is not one for summary judgment, that there is significant evidence from which a jury could find the defendants liable. And we ask that you reverse and remand the case for a trial. Thank you, Your Honors. We thank you. And we'll come down and recounsel and take a brief recess. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Robert B. King